# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| AZEEZ RABIU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| ABBOTT LABORATORIES, | ) | **Jury Trial Demanded** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT AT LAW

NOW COMES the Plaintiff, AZEEZ RABIU ("RABIU" or "Plaintiff"), through his attorneys, Henderson Banks Law, and for his Complaint at Law, states as follows:

## JURISDICTION

1.     This is a suit in equity authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e)-2.  The jurisdiction of this court is invoked pursuant to  28 U.S.C. § 1332(a)(1) as the parties are citizens of different states and the amount in controversy exceeds $75,000. Jurisdiction is also invoked pursuant to 28 U.S.C. §§ 1343(a)(3) and (4) and 28 U.S.C. § 1331 to secure protection of and to address deprivation of rights secured by 42 U.S.C. §2000(e)-2, providing for declaratory, injunctive, compensatory, and other relief against employment discrimination based upon race and retaliation.  Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

2.     Venue in this district is proper under 28 U.S.C. §1391(B)(1) and (2).   The Defendant resides or resided in this district and the events giving rise to Plaintiff's claims occurred here.

3.     All conditions precedent to jurisdiction have occurred or been complied with, to-wit:

    a. A charge of employment discrimination was filed with the Illinois Department of Human Rights ("IDHR"), by Plaintiff AZEEZ RABIU ("RABIU"), on January 31, 2022, a copy of which is attached hereto as **Exhibit 1.**

    b. RABIU was issued a notice of dismissal IDHR on January 12, 2023, a copy of which is attached hereto as **Exhibit 2**.

## PARTIES

4.    RABIU is a citizen of the United States and the State of Illinois. He currently resides in Arlington Heights, Illinois.

5.    RABIU is a member of a protected class, Black.

6.    RABIU was, at all relevant times, employed by the Defendant herein, ABBOTT LABORATORIES ("Defendant" or "ABBOTT").

7.    ABBOT is a Delaware corporation with its principal place of business in Illinois.

8.    ABBOT was, at all relevant times, a developer and manufacturer of medical devices and a life sciences company. ABBOT employs approximately more than 100,000 employees.

9.    ABBOTT is an employer as that term is defined under the under Civil Rights Act of 1964, as amended.

## BACKGROUND FACTS

10.    Plaintiff is a member of a protected class, Black.

11.    In August of 2017, RABIU began working for Defendant at its facility in Lake Bluff, IL.

12.    RABIU started as a Senior Procurement Specialist (Level 16) supporting the Business Consulting category. RABIU reported to Ceaneh Alexis (black), Senior Category Manager of the Human Capital category (Level 20).

13.    RABIU's responsibilities as Senior Procurement Specialist included managing category spend, negotiating contracts, consulting statuses, working with internal stakeholders to

understand the needs of the business, and then going to external vendors to meet those needs; and also working on commercial cost savings for Defendant.

14.     For the entire time that he was a Senior Procurement Specialist, RABIU performed these duties to Defendant's legitimate expectations.

### RABIU is assigned the work of more than three people

15.     RABIU's colleagues in his procurement group were Emily Coronado (non-black), Category Lead, Management Consulting and Core Business Services (level 18) and Annaliece Gargiulo (non-black), Category Lead, Contingent Labor (level 18). None of RABIU's colleagues in his procurement group did exactly what he did.

16.     On or about April 2018, Coronado transitioned to another role within the company. Defendant did not backfill her role on RABIU's team.

17.     On or about August 2018, Gargiulo transitioned out of the company.  Defendant did not backfill her role on RABIU's team.

18.     On or about October 2018, Alexis transitioned out of the company. Defendant did not backfill her role on RABIU's team, but some of her responsibilities were transitioned to Mark Troth (non-black), Director, Category Procurement (level 21). Mark Troth (non-black) was assigned as RABIU's manager on or about December 2018.

19.     Because Coronado, Gargiulo, and Alexis's roles were not backfilled, RAIBU had to take on some of their responsibilities upon their departure. As a result, RABIU's duties increased substantially, and he had to work around 80 hours per week to keep key operational activities going.

20.     RABIU's dramatic increase in responsibilities, including those of *three* higher-level roles, meant that he was effectively doing the work of a Senior Manager (level 20), without the title and compensation.

3

21.     As a result of RABIU's increased workload, he had to cancel his travel plans to see his family in November and December of 2018. RABIU obtained approval from his manager, Troth, to carry the unused vacation days over into 2019, provided that he used them before the end of Q1.

**RABIU succeeds, but is denied recognition and compensation for his increased workload**

22.     Despite the substantially increased workload, RABIU successfully delivered on all of his assigned goals for 2018, as well as other larger initiatives within the company. This was reflected in his 2018 end of year performance review, and Rabiu received a rating of "Best at Abbot". This performance review was conducted & approved by Megan Wilson, Senior Director of Procurement, on or about February 2019.

23.     On or about April 10, 2019, RABIU was asked to apply for a Category Lead role (level 18). In the new role, RABIU would continue to perform the same Senior Manager (level 20) equivalent duties as before, with the same insufficient level of support.

24.     RABIU had requested another role within the company where he could further grow, or to be considered for a level 20 role because he had been successfully performing level 20 responsibilities with limited resources. This level 20 role would have granted RABIU the title, recognition, and compensation commensurate with the duties that he was actually performing.

25.     RABIU was persuaded to take the level 18 role by the CPO, Ric Schneider, on the promise that working for his new manager Neelam Kelly (non-black) would give him the visibility to be credited for his achievements. Neelam Kelly moved into another role a few weeks later.

26.     RABIU requested a 15% increase in pay based upon his demonstrated skills at the and the high-level responsibilities which he was performing. This request was rejected.

27.     RABIU continued to support the entire Human Capital category alone, while also supporting the Research and Development workstream, with only a sourcing operations team

member Carla McCombs. RABIU continued having to work 80-hour weeks to keep up with his duties.

### RABIU's health deteriorates as a result of his increased workload

28.　　As a result of working 80-hour weeks for multiple consecutive months, RABIU's health began to deteriorate. RABIU experienced severe neck, shoulder, and back pain.

29.　　On or about April 29, 2019, RABIU was diagnosed with "severe muscle spasm" caused by stress. He was prescribed cyclobenzaprine as a muscle relaxer and referred to physical therapy. RABIU started physical therapy at Athletico in Deerfield on or about May 7, 2019.

30.　　RABIU requested a flexible working arrangement to seek treatment for his muscle spasms. This request was granted, and RABIU was allowed to visit the physical therapy clinic once a week during work hours, so long as he returned to work afterwards.

31.　　Three weeks later, the flexible working arrangement was cancelled, even though RABIU needed the arrangement to be able to seek treatment.

### Defendant repeatedly denies RABIU's requests for support

32.　　On May 8, 2019, RABIU met with Troth to discuss a program RABIU had developed which could help the procurement group deliver on a critical margin and improvement goal. RABIU also asked Troth for support on his workload. Troth responded that he wanted RABIU to lead the project but did not offer any support for RABIU's other critical responsibilities. As a result, RABIU left the meeting with even *more* work on his plate.

33.　　On May 14, 2019, RABIU met with Terry Park, Director of Business Human Resources (non-black), to discuss RABIU's unsustainable workload. RABIU told Park that he was required to do the work of at least three employees, including work which was considered director and senior manager-level deliverables, without any support. RABIU specifically mentioned that

Troth had directed him to lead his new project without any support for his workload. RABIU stated that this was affecting his mental and physical health.

34.     At the meeting, RABIU also told Park that he was concerned that he was being discriminated against on the basis of race because the Marketing team, and every other team, none of whose members were black, was being given more resources than his Human Capital team. HR had canceled the posted backfills for Coronado and Gargiulo, whose work RABIU had been doing since they transitioned out in Fall of 2018. Park told RABIU to write up his current workload and schedule a call with Megan Wilson (non-black).

35.     On May 22, 2019, RABIU met with Wilson to discuss his workload and health concerns. Wilson assigned Meenu Raval, Senior Manager (non-black) as RABIU's new manager and directed him to follow up with her. Wilson also directed RABIU to discuss his workload with newly-hired Amy Eng, Global Category Lead (non-black).

36.     On May 30, 2019, RABIU met with Eng as directed by Wilson. Unlike RABIU, who was expected to take on extra duties and projects far beyond his pay grade, Eng refused to provide any support on the operational projects and workflows with which RABIU needed help. Eng only offered to provide limited help with organizational policies.

37.     On May 5, 2019, RABIU met with Raval to discuss his workload and his unproductive meeting with Ang. RABIU informed Raval of his deteriorating health as a result of his expanded role. Raval directed RABIU to schedule a meeting with her, Wilson, and Park to discuss.

38.     On May 10, 2019, and before the scheduled meeting, RABIU again met with Raval. RABIU told Raval that he would need more support for the Human Capital team, given Ang's limited definition of her role on the team. RABIU noted that other categories were being given additional resources, while his Human Capital team was being expected to do more with less.

RABIU stated that it was unfair to expect him and the RPO team member Carla McCombs to continue to overwork themselves to meet their goals.

39.     This pattern continued into 2019 and 2020:

    a.   RABIU was expected to perform responsibilities above and beyond his role, with almost no support.

    b.   RABIU's extreme workload meant he often worked 80-hour weeks, and destroyed his mental and physical health.

    c.   In spite of these odds, RABIU would meet his goals, delivering value to the company.

    d.   RABIU would be denied recognition for his achievements, as well as promotions and raises.

    e.   RABIU's own accomplishments would often be attributed to other non-black employees.

    f.   RABIU would be expected to continue performing his unsustainable work, without support.

    g.   But other similarly situated non-black employees would receive more support and resources for their own work.

**Defendant begins retaliating against RABIU for his complaints of racial discrimination**

40.     On June 11, 2019, RABIU met with Raval, Wilson, and Park to discuss his concerns about his increased workload, lack of support, and declining health. RABIU complained that it seemed that he was being set up to fail while other non-black employees were being set up to succeed. RABIU noted that he and another black employee, Carla McCombs, had been repeatedly asked to do more with less, not recognized for our achievements, and denied support and resources. RABIU stated that it was insinuated that he and McCombs only worked well together because they

"liked each other", insinuating they were romantically involved. RABIU stated that he observed other team members of different races being rewarded for delivering less value to the company, such as Murali Venugopalan (non-black).

41.     Following the June 11, 2019 meeting where RABIU expressed concern that he was being treated differently on the basis of race, Raval became hostile to him. Raval began intimidating, harassing, and publicly undermining RABIU.

42.     On or about September 15, 2019, Troth denied RABIU's request to carryover unused holidays, despite the fact that Troth had earlier approved such a request.

43.     Troth also refused to reimburse RABIU for the days that he had to work while he was on vacation. This, despite the fact that Troth was the one who requested that RABIU work while on paid vacation.

44.     On information and belief, Troth denied RABIU's vacation day carryover and reimbursement requests in retaliation for RABIU's discrimination complaints at the June 11, 2019 meeting. This is because Troth had previously granted RABIU's carryover request in 2018.

45.     RABIU reported Troth's conduct to the employee relations team, who never followed up on the issue.

46.     On or about September 16, 2019, Raval canceled the pre-existing flexible working arrangement whereby RABIU was allowed to seek medical treatment during work hours. When asked why, Raval responded that "Management doesn't support remote work", even though the arrangement required RABIU to return to the office during work hours. Raval directed RABIU to apply for FMLA to attend physical therapy. As a result, RABIU had to start taking unpaid leave to attend physical therapy.

47.     On or about September 17, 2019, Raval denied RABIU's application for flexible working arrangement. RABIU had requested to work remotely for one week to support his sick

mother in Nigeria who needed emergency surgery. RABIU complained that he wanted to continue working visiting his mother because there was no-one available who could do his work while he was away. Regardless, RABIU could not use vacation days because Troth had earlier rescinded his approval to carryover unused vacation days. As a result, RABIU was again forced to take unpaid leave.

48. On information and belief, Raval canceled RABIU's flexible working arrangement and denied his remote work request in retaliation for his complaints of racial discrimination, and not based on company policy. This is because other non-black employees of Defendant were afforded flexible working arrangements, despite Raval's claim that such an arrangement was not allowed. For example, Meghan McGill (non-black) was allowed to work remotely to be with her parents when her grandmother died in September 2019.

49. On or about September 20, 2019, RABIU applied and interviewed for a Senior Manager role under Murali Venugopalan for the Research and Development Team ("RND"). RABIU was denied this opportunity, even though he met and exceeded all required qualifications for the role. RABIU had been effectively doing the work of a Senior Manager while supporting the Human Capital team for more than a year, in addition to his responsibilities as category lead. The hiring manager told RABIU that Wilson prevented him from hiring RABIU. Upon information and belief, Wilson did this in on the basis of race, and in retaliation for RABIU's statements at the June 11, 2019 meeting, and not due to his qualifications for the role.

50. The role was later put on hold, but Raval directed RABIU to continue to own and lead this workstream. Thus, once again, RABIU was asked to continue doing the work of a Senior Manager, while being denied the pay and recognition of a Senior Manager.

51. On or about September 25, 2019, Raval handed RABIU a strongly worded and threatening letter while he was heading out of the office. Raval's letter was unjustified and violated

company policy. Raval never had any prior discussion with RABIU about his performance. On information and belief, Raval did this to harass and intimidate RABIU following the June 11, 2019 meeting. This is because Raval later sent RABIU an email confirming that the letter was not justified.

52.     On or about March 20, 2020, Raval gave RABIU an unfavorable performance review for 2019. When asked why, Raval stated "Management thinks you struggled during the year". This performance review was contrary to overwhelming documented evidence. This negative performance review was used to justify a lower merit score, which resulted in reduced bonuses and compensation. Upon information and belief, the negative review was in retaliation for RABIU's discrimination complaints at the June 11, 2019 meeting.

53.     No other similarly situated non-black employees of Defendant were subject to the same unfair treatment as RABIU during this time.

54.     On June 6, 2020, Abbott CEO Robert Ford held a town hall meeting for what seem to be a subset of the black employee population, where he stated that he said he was aware of a case of extreme racism and he promised to take immediate actions to resolve it including making the employees involved whole and compensating them.

55.     Robert Ford specifically mentioned issues within RABIU's claim and stated that the matter would be resolved, leading RABIU to believe this was a promise to rectify his claims of discrimination.

### The false and retaliatory 2020 Performance Review

56.     On or about June of 2020, RABIU was diagnosed with chronic depression and post-traumatic stress disorder.

57.     As a result, RABIU went on FMLA leave .

58.     In January of 2021, RABIU had a meeting with Jose Silva (non-black) to discuss his return to work. Silva instructed RABIU to reach out to Robert Lanton, Senior Procurement Manager (black).

59.     Lanton had been at the company since November of 2020, and was RABIU's supervisor from November onwards. Lanton was responsible for assigning categories and supporting the team.

60.     Upon RABIU's return, he should have reported directly to Lanton. Thus, RABIU expected that Lanton would be completing RABIU's performance review for 2020.

61.     However, Silva made RABIU report directly to him.

62.     When RABIU asked Silva why he was not reporting to Lanton, Silva stated that "this is what management said and they would not want what happened last time to repeat itself." RABIU asked what Silva meant, but Silva cut him off and did not respond.

63.     When RABIU later discussed the matter with Lanton, Lanton stated that he was told that he would be RABIU's manager, but that Silva was delaying the switch.

64.     On February 12, 2021, Silva scheduled RABIU's 2020 performance review meeting for February 18, 2021.

65.     Per company policy, RABIU requested a copy of the performance review document in advance of the meeting. Silva did not send him the document in advance.

66.     At the February 18, 2021 meeting, Silva ambushed RABIU with a negative performance review, which stated that RABIU was "behind peers". Silva had RABIU read the review during the meeting and provide answers to Silva's negative comments in real time. When RABIU asked for clarification on Silva's complaints, Silva rudely cut him off by saying that he was "not discussing that".

11

67.     At the meeting, RABIU complained that Silva's conduct deviated from company standards. Silvia's failure to give him the performance review in advance deprived him of the opportunity to meaningfully respond to Silva's criticism.

68.     The 2020 performance review was not based upon Silva's own observations of RABIU. Silvia had never managed or supervised RABIU at any point in 2020, and his only personal experience with RABIU was a handful of brief meetings in 2021.

69.     Silva told RABIU that the negative review was recommended by RABIU's previous manager in 2020, Arti Shadid (non-black).

70.     As discussed above, managements' criticisms of RABIU in 2020 were not based upon RABIU's actual performance but were in retaliation for his complaints about unequal treatment and racial discrimination.

71.     The 2020 performance review contained more false accusations against RABIU from his former managers. It referenced conversations which never occurred and false deliverables that were never communicated.  These accusations were contrary to RABIU's actual, documented performance in 2020, as he had achieved all his assigned goals for that year.

72.     RABIU told Silva that he believed that he was being punished for raising concerns about his last manager and other employees, and for complaining about discrimination.

73.     On February 24, 2021, RABIU received a finalized copy of the 2020 performance review. This final copy contained additional negative comments and changes which were not discussed at the February 18, 2021 meeting. This addition of undisclosed changes was contrary to company policy.

74.     As a result of the false and unjustified performance review, RABIU suffered another reduction in compensation.

75. Upon information and belief, Silvia had access to Defendants' employee file for RABIU. Upon information and belief, Silva was aware of RABIU's comments at the June 11, 2019 meeting, either through RABIU's file or through communicating with RABIU's prior managers. Upon information and belief, Silva was also aware of RABIU's earlier complaints of discrimination to management in 2019 and 2020.

76. Upon information and belief, RABIU's prior managers from 2020 contacted Silva and requested that he prepare a negative 2020 performance review for RABIU. This review served as a vehicle for RABIU's old discriminatory managers from 2020 to once again bring their false accusations against him and hurt his career.

77. Upon information and belief, Silva knew that the accusations and criticisms contained in RABIU's 2020 performance review were false or was indifferent to their truth. Silva ignored RABIU's attempts to explain himself at the performance review meeting and was only concerned with punishing RABIU.

78. Upon information and belief, Silva inserted himself into RABIU's post-leave onboarding for the express purpose of preparing and delivering the negative 2020 performance review and punishing RABIU.

79. But for Silva's intervention, RABIU would have reported directly to Lanton upon his return, and Lanton would have prepared the 2020 performance review.

80. Lanton worked with RABIU throughout 2021 and was familiar with RABIU's performance. RABIU later asked Lanton if he had any complaints or concerns regarding RABIU's performance, and Lanton responded that he did not.

81. Upon information and belief, had Lanton been allowed to prepare RABIU's 2020 performance review, it would have fairly reflected his actual performance and accomplishments

in 2020. And had RABIU reported directly to Lanton in 2021, RABIU's return to work would have been free from discrimination and retaliatory treatment.

**<u>Silva forces RABIU out of the company</u>**

82.     On February 23, 2021, RABIU attended a 2020 Goals Review meeting with Silva. At the meeting, Silva assigned RABIU goals which were the responsibilities of other employees, and which contradicted the responsibilities that Lanton had assigned to him. RABIU expressed his concern to Silva that he was being managed by two people with conflicting expectations. RABIU stated that he was afraid that this would lead to confusion, but also that he was being set up to fail.

83.     On February 25, 2021, Silva sent RABIU Silva's finalized goal for RABIU. RABIU again complained that the proper process for goal setting was not being followed, and that he was being set up to fail by working with one manager all year long while having another complete his performance review.

84.     On March 12, 2021, Silva abruptly summoned RABIU to his office for a face-to-face meeting. RABIU was not supposed to be in on that date. Silva informed RABIU that the meeting was to warn him of several infractions of company policies.

85.     Silva gave RABIU the written warning, containing his alleged infractions. Some of these included alleged inappropriate behavior at the February 18, 2021 performance review. RABIU explained that some of the allegations were false, and none rose to the level of an infraction. RABIU stated that he believed the letter was intended to threaten him and silence his complaints of discrimination. Silva became rude and stated, "I just want you to know that any mistake can get you fired, and we are tired of doing this and can't do it anymore."

86.     Upon information and belief, Silva's written warning was in retaliation for RABIU's complaints of racial discrimination and retaliation at the February 18, 2021 meeting.

87. Following the March 12, 2021 meeting, Silva continued making demeaning and threatening comments towards RABIU such as "We don't really want you there" and "we don't need someone like you there." The common theme of these comments was that RABIU was not wanted at the company and could be fired at any minute. Silva made these comments several times a month, both over the phone and during meetings with RABIU.

88. Upon information and belief, Silva did not talk to any similarly situated non-black employees in this way.

89. In April of 2021, RABIU complained to corporate human resources about his situation. RABIU was told they would investigate. Nothing ever came of this investigation.

90. RABIU's already damaged mental health continued to deteriorate under Silva's oppressive and demeaning conduct. He had just returned from medical leave due to work-related stress and was now his latest supervisor was telling him almost weekly that he was not wanted and could be fired at any time. RABIU lived in constant anxiety and fear of losing his job, or otherwise being retaliated against for sharing his concerns with management.

91. Moreover, RABIU knew that no matter how hard he worked and how much he accomplished, he would never receive the same acknowledgement and support as his non-black colleagues. RABIU could only expect to receive unfair and negative evaluations, in retaliation for his complaints of discrimination.

92. Silva knew that RABIU had been diagnosed with chronic depression and PTSD, and that RABIU took his earlier leave of absence because of these conditions.

93. Upon information and belief, Silvia began his campaign of harassment, threats, and intimidation with the express purpose of preying on RABIU's vulnerable mental condition and forcing him out of the company for good.

94.     Starting on April 28, 2021, RABIU took a personal leave of absence, with a return-to-work date of May 27, 2021.

95.     Silva continued making demeaning comments towards RABIU even during his leave, into May of 2021.

96.     On May 21, 2021, RABIU requested a 10-day extension to his approved leave, which Defendant denied.

97.     On May 27, 2021, RABIU tendered his resignation.

98.     RABIU resigned based on unfair treatment and his work environment being hostile.

## COUNT I – CONSTRUCTIVE TERMINATION BASED ON RACE
### Title VII

99.     RABIU reincorporates and realleges Paragraphs 1 through 98 as though more fully set forth herein.

100.    Plaintiff is a member of a protected class, Black.

101.    Plaintiff performed his job to Defendant's legitimate expectations.

102.    On May 27, 2021, Plaintiff resigned.

103.    Plaintiff's working conditions were so intolerable in a discriminatory way that a reasonable person would be compelled to resign.

104.    This included, in particular:

    a.  Defendant's assigning Plaintiff an unreasonable amount of work, far in excess of the duties in his job title, and far more than any similarly situated non-black employees;

    b.  Defendant's failure to promote or compensate Plaintiff commensurate with the level of work that he was assigned;

16

c.  Defendant's refusing to provide support for the overburdened Plaintiff, while allocating more resources to his similarly situated non-black colleagues;

d.  When Plaintiff finally complained that he was being treated less fairly than his non-black colleagues, Defendant's managers began a campaign of retaliatory conduct against Plaintiff;

e.  Defendant's campaign of overworking and retaliating against Plaintiff was so bad that it contributed to his eventual diagnoses of depression and PTSD, forcing him to take an extended period of medical leave;

f.  When Plaintiff finally returned to work, Defendant continued its campaign of retaliation and unfair treatment through Silva.

g.  Silva's 2020 performance review punished Plaintiff, based upon the retaliatory and false statements of Plaintiff's prior managers;

h.  Silva attempted to double Plaintiff's workload by assigning him completely different duties than Plaintiff's manager Lanton;

i.  Silva berated and threatened Plaintiff several times a month from March of 2021 onwards;

j.  Defendant's conduct was so egregious that Plaintiff *again* had to take another period of personal leave to escape the harassment and retaliation; and,

k.  Silva *continued* harassing and threatening Plaintiff even while Plaintiff was on leave.

l.  Defendant's treatment was unbearable, considering that Plaintiff already suffered from work-related PTSD and severe depression.

105.  Plaintiff resigned knowing that Defendant would only continue to treat him poorly upon his return. Plaintiff knew that he would continue to be overworked and denied the recognition

17

of his non-black colleagues. Plaintiff knew that he would continue to suffer unfair and retaliatory behavior from his managers, all because he dared to complain about his discriminatory treatment.

106.     Defendant, through its agent Silva, acted in a manner so as to have communicated to a reasonable employee that they will be terminated.

107.     This included, in particular:

a.   Silva's 2020 performance evaluation, which repeated false and unsupported accusations by Plaintiff's prior discriminatory managers;

b.   Silva's conduct in connection with the performance evaluation, which communicated that he was only concerned with punishing Plaintiff, and did not care what Plaintiff had to say about his performance in 2020;

c.   Silva's comments in 2021 that Plaintiff was not wanted at the company; and,

d.   Silva accusing Plaintiff of false infractions, and repeatedly telling Plaintiff that he could be fired at any time;

108.     Plaintiff saw the "writing on the wall" following his return from medical leave in January of 2021: Defendant had not forgotten about Plaintiff's earlier complaints of racial discrimination, and Plaintiff would either be fired or should quit.

109.     Similarly situated employees outside of Plaintiff's protected class were treated more favorably.

110.     Plaintiff resigned as a direct result of Defendant's discriminatory conduct.

111.     Defendant's conduct amounted to constructive discharge, on the basis of race, in violation of Title VII.

112.     Defendant knew that its treatment of RABIU violated Title VII and 42 U.S.C. §1981.

113.     Plaintiff demands a jury trial.

18

**WHEREFORE**, Plaintiff, AZEEZ RABIU, respectfully prays that this Honorable Court:

a. Enter a declaratory judgment that the practices complained of herein are unlawful and in violation of Title VII;

b. Permanently enjoin Defendant, its agents, successors, officers, employees, attorneys, and those acting in concert with it or them from engaging in each of the unlawful practices, policies, customs, and usages set forth herein, and from continuing the unlawful practices, policies, customs, and usages set forth herein, and from continuing any and all practices shown to be in violation of applicable law;

c. Order modification or elimination of the practices, policies, customs, and usages set forth herein and all other such practices shown to be in violation of applicable law so that they will not retaliate in violation of law;

d. Compensate and make RABIU whole for all earnings, wages, including prejudgment interest and other benefits that he would have received but for the discriminatory practices of Defendant;

e. Award RABIU compensatory damages;

f. Award RABIU the costs and disbursements of this action, including reasonable attorney's fees;

## COUNT II – UNEQUAL TERMS AND CONDITIONS OF EMPLOYMENT BASED ON RACE
### Title VII

114.    RABIU reincorporates and realleges Paragraphs 1 through 98 as though more fully set forth herein.

115.     Plaintiff is a member of a protected class, Black.

116.     Plaintiff was hired as a Senior Procurement Specialist in August of 2017, and ultimately promoted to Category Lead on or about April of 2019.

117.     Plaintiff's responsibilities included managing category spend, negotiating contracts, consulting statuses, working with internal stakeholders to understand the needs of the business, and then going to external vendors to meet those needs; and also working on commercial cost savings for Defendant

118.     Plaintiff performed his job to Defendant's legitimate expectations.

119.     Defendant subjected Plaintiff to unequal terms and conditions of employment, setting Plaintiff up to fail while setting similarly situated non-black employees up to succeed.

120.     Plaintiff's unequal treatment included, in particular:

    a.   Defendant requiring Plaintiff to perform the additional duties of nearly three other employees, after Plaintiff's two colleagues and then-supervisor transitioned out in 2018. This workload was not only excessive but included managerial duties above Plaintiff's position.

    b.   Defendant failing to backfill these vacancies, requiring Plaintiff to continue performing these extra duties through at least June of 2020;

    c.   Troth requiring Plaintiff to lead a major project in May of 2019, on top of his already excessive workload;

    d.   Silva assigning Plaintiff duties in February of 2021, in addition to the duties assigned to Plaintiff by his manager Lanton;

    e.   Defendant denying Plaintiff's repeated requests for support with his excessive workload;

f.  Plaintiff having to cancel vacation plans, work while on vacation, and work on days when he had to leave the office to go to physical therapy;

g.  Defendant denying Plaintiff's requests for reimbursement for vacation days on which he had to work;

h.  Defendant denying Plaintiff's request for flexible working conditions on days when he had physical therapy, requiring Plaintiff to take unpaid leave even though he worked on those days;

i.  Defendant denying Plaintiff's request for remote work while caring for his mother in Nigeria, requiring Plaintiff to take unpaid leave even though he worked during that time;

j.  Defendant giving Plaintiff unjustified poor performance reviews, even though Plaintiff succeeded at performing his excessive duties, and docking his pay;

k.  Defendant denying Plaintiff recognition for his accomplishments, and giving non-black employees recognition for Plaintiff's own achievements; and,

l.  Defendant, through Silva, singling out Plaintiff for punitive and cruel treatment upon his return from leave in January of 2021.

121.  Similarly situated employees outside of Plaintiff's protected class were treated more favorably. In particular:

a.  No non-black Senior Procurement Specialists or Category Leads were assigned the same amount of extra work that Plaintiff was assigned;

b.  Other groups with non-black Category Leads had vacancies backfilled, while the vacancies in Plaintiff's group were not;

c.  Other similarly situated non-black employees were otherwise granted support and resources that Plaintiff was denied;

21

    d. Other similarly situated non-black employees were granted flexible working conditions and remote work, even though Plaintiff was told that such arrangements were not allowed;

    e. Other similarly situated non-black employees received more favorable performance reviews for achieving less than Plaintiff;

122. Defendant subjected Plaintiff to this unequal treatment on the basis of his race.

123. Defendant knew that its treatment of RABIU violated Title VII and 42 U.S.C. §1981.

124. Plaintiff demands a jury trial.

**WHEREFORE**, Plaintiff, AZEEZ RABIU, respectfully prays that this Honorable Court:

    a. Enter a declaratory judgment that the practices complained of herein are unlawful and in violation of Title VII;

    b. Permanently enjoin Defendant, its agents, successors, officers, employees, attorneys, and those acting in concert with it or them from engaging in each of the unlawful practices, policies, customs, and usages set forth herein, and from continuing the unlawful practices, policies, customs, and usages set forth herein, and from continuing any and all practices shown to be in violation of applicable law;

    c. Order modification or elimination of the practices, policies, customs, and usages set forth herein and all other such practices shown to be in violation of applicable law so that they will not retaliate in violation of law;

    d. Compensate and make RABIU whole for all earnings, wages, including prejudgment interest and other benefits that he would have received but for the discriminatory practices of Defendant;

22

e.   Award RABIU compensatory damages;

f.   Award RABIU the costs and disbursements of this action, including reasonable attorney's fees;

g.   Award RABIU and grant such relief as may be just and proper.

## COUNT III – DENIAL OF FLEXIBLE WORKING CONDITIONS BASED ON RACE
### Title VII

125.   RABIU reincorporates and realleges Paragraphs 1 through 98 as though more fully set forth herein.

126.   Plaintiff is a member of a protected class, Black.

127.   Plaintiff performed his job to Defendant's legitimate expectations.

128.   Defendant denied Plaintiff's reasonable requests for flexible working conditions:

a.   On September 16, 2019, when Plaintiff asked for a flexible working arrangement to attend physical therapy during workdays; and,

b.   On September 17, 2019, when Plaintiff asked to work remotely while caring for his mother in Nigeria.

129.   Similarly situated employees outside of Plaintiff's protected class were treated more favorably. Defendant granted non-black employees' requests for flexible working arrangements in similar circumstances. This included at least one non-black employee's request to work remotely when a family member died. Defendant had told Plaintiff that remote work was not allowed.

130.   Defendant denied Plaintiff's requests on the basis of his race.

131.    Defendant knew that its treatment of RABIU violated Title VII and 42 U.S.C. §1981.

132.    Plaintiff demands a jury trial.

**WHEREFORE**, Plaintiff, AZEEZ RABIU, respectfully prays that this Honorable Court:

a.  Enter a declaratory judgment that the practices complained of herein are unlawful and in violation of Title VII;

b.  Permanently enjoin Defendant, its agents, successors, officers, employees, attorneys, and those acting in concert with it or them from engaging in each of the unlawful practices, policies, customs, and usages set forth herein, and from continuing the unlawful practices, policies, customs, and usages set forth herein, and from continuing any and all practices shown to be in violation of applicable law;

c.  Order modification or elimination of the practices, policies, customs, and usages set forth herein and all other such practices shown to be in violation of applicable law so that they will not retaliate in violation of law;

d.  Compensate and make RABIU whole for all earnings, wages, including prejudgment interest and other benefits that he would have received but for the discriminatory practices of Defendant;

e.  Award RABIU compensatory damages;

f.  Award RABIU the costs and disbursements of this action, including reasonable attorney's fees;

## COUNT IV – DENIAL OF ADVANCEMENT BASED ON RACE
### Title VII

133.    RABIU reincorporates and realleges Paragraphs 1 through 98 as though more fully set forth herein.

134.    Plaintiff is a member of a protected class, Black.

135.    Plaintiff performed his job to Defendant's legitimate expectations.

136.    Plaintiff applied for the role of Senior Manager (level 20) on or about September of 2019 and January of 2020.

137.    Plaintiff was qualified for the role of Senior Manager (level 20), as he had effectively been performing the duties of a Senior Manager since 2018 and had been consistently delivering despite a lack of resources.

138.    Defendant denied Plaintiff advancement despite his qualifications.

139.    Similarly situated employees outside of Plaintiff's protected class were treated more favorably. In particular:

a.    Plaintiff was more qualified for the role of Senior Manager than existing non-black Senior Managers; and,

140.    Defendant denied Plaintiff's applications on the basis of his race.

141.    Defendant knew that its treatment of RABIU violated Title VII and 42 U.S.C. §1981.

142.    Plaintiff demands a jury trial.

**WHEREFORE**, Plaintiff, AZEEZ RABIU, respectfully prays that this Honorable Court:

a. Enter a declaratory judgment that the practices complained of herein are unlawful and in violation of Title VII;

b. Permanently enjoin Defendant, its agents, successors, officers, employees, attorneys, and those acting in concert with it or them from engaging in each of the unlawful practices, policies, customs, and usages set forth herein, and from continuing the unlawful practices, policies, customs, and usages set forth herein, and from continuing any and all practices shown to be in violation of applicable law;

c. Order modification or elimination of the practices, policies, customs, and usages set forth herein and all other such practices shown to be in violation of applicable law so that they will not retaliate in violation of law;

d. Compensate and make RABIU whole for all earnings, wages, including prejudgment interest and other benefits that he would have received but for the discriminatory practices of Defendant;

e. Award RABIU compensatory damages;

f. Award RABIU the costs and disbursements of this action, including reasonable attorney's fees;

Respectfully submitted,
AZEEZ RABIU,


By:    /s/ Henderson M. Banks
One of his attorneys

Henderson M. Banks
**Henderson Banks Law**
77 W. Wacker Drive., Floor 45
Chicago, Illinois 60601
(773) 383-3289
hbanks@hendersonbankslaw.com

Respectfully submitted,

AZEEZ RABIU,

By:    /s/ Henderson M. Banks
One of his attorneys

Henderson M. Banks
**Henderson Banks Law**
77 W. Wacker Drive., Floor 45
Chicago, Illinois 60601
(773) 383-3289
hbanks@hendersonbankslaw.com

## VERIFICATION BY CERTIFICATION

Pursuant to Title 28, Section 1746 of the U.S. Code, the undersigned hereby certifies under penalty of perjury that the statements set forth in the foregoing instrument are true and correct, except as to matters therein stated to be on information and belief and, as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

_April 10 2023_

Azeez Rabiu