IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Azeez Rabiu,                          )
                                      )
        Plaintiff,                    )
                                      )
                                      )
        v.                            )        No. 23 C 2253
                                      )
                                      )
Abbott Laboratories,                  )
                                      )
        Defendant.                    )


Memorandum Opinion and Order

In this Title VII case, defendant Abbott Laboratories moved for the entry of default judgment in order to avoid the deposition of its CEO. I entered that default and now before me are plaintiff Azeez Rabiu's Memorandum of Damages and Supporting Evidence ("Damages Memo"), Abbott's objections to the Damages Memo, and Rabiu's response to a minute entry in which I directed him to clarify certain factual issues and points of dispute.

1

**I.**

A factual summary will frame the issue of remedies.[1] Rabiu went to work for Abbott, a multinational pharmaceutical company, in 2017. Over the course of 2018, three of Rabiu's co-workers left his team and were not replaced, leaving Rabiu to take on their responsibilities. Rabiu began working 80-hour weeks as a result. The stress of overwork eventually led Rabiu to suffer from muscle spasms which caused him neck and shoulder pain. During this same period, Rabiu, who is black, noticed other, non-black employees receiving more resources and recognition than him.

In the summer of 2019, Rabiu began to complain about this disparate racial treatment to his superiors and to members of the human resources department at Abbott. Following his complaints, Rabiu's supervisors began "intimidating, harassing, and publicly undermining" him. ECF 1 at 8. In September 2019, Rabiu interviewed for a Senior Manager position, but one of his now-hostile superiors blocked the promotion. In early 2020, Abbott produced a performance review which underrated Rabiu's contributions to the company. While he had previously been rated "Best at Abbott," this review

---

[1] Following default, "Any allegations in the complaint relating to liability are considered true." *Domanus v. Lewicki*, 742 F.3d 290, 303 (7th Cir. 2014).

was negative, which resulted in "reduced bonuses and compensation." *Id.* at 4, 10.

In June 2020, Rabiu was diagnosed with depression and post-traumatic stress disorder, and he took a six-month medical leave of absence. Rabiu's next annual performance review again underrated his performance. The racially disparate treatment became increasingly intolerable and led to Rabiu's constructive discharge in May 2021.

## II.

While he was previously represented, Rabiu is now proceeding *pro se*, and I am mindful that courts should read uncounseled filings generously. *Korsunskiy v. Gonzales*, 461 F.3d 847, 850 (7th Cir. 2006) ("If the judge can see what the *pro se* litigant is driving at, that is enough.").

Rabiu prays for relief as follows. First, he requests $1,367,756 in back pay, calculating his salary according to a schedule of promotions that he claims he would have received had Abbott not subjected him to disparate treatment. Second, Rabiu requests $17,084,737 in front pay, claiming that he would have continued working and being promoted at Abbott until his retirement. Third, he requests that I grant him prejudgment interest and then adjust his awards upwards to offset his tax liability. Fourth, Rabiu requests $300,000 in compensatory damages

for his emotional and physical distress. Fifth, he requests $300,000 in punitive damages. Sixth, he attempts to preserve a claim under 42 U.S.C. § 1981.[2] Seventh, Rabiu requests $10,000,000 on the basis that Abbott's CEO told him, "'*We will give you money*.'" ECF 185 at 15 (emphasis in original). Eighth, he asks for $68,600 to pay for future psychological treatment. Ninth, he asks for attorney's and expert's fees. And finally, he makes several equitable requests: that I enjoin Abbott to erase any negative commentary from his employment records and to issue a written apology for failing to "*give* [him] *money*" in line with its CEO's promise; that I make clear that "his termination and the resulting career interruption were the result of unlawful discrimination;" and that I write a "continuing enforcement clause" into my decision. *Id.* at 19–20. I will address each of those requests in turn, grouping them by theme.

### A. The Expert Reports

Much of the argument in Rabiu's Damages Memo is based on the conclusions reached by two expert reports that he attached to it.

---

[2] Late in this litigation, Rabiu moved for leave to file a first amended complaint making out a cause of action under 42 U.S.C. § 1981, which would not be subject to the same damages caps that apply to Title VII. ECF 163. I denied that motion. ECF 180. I denied a motion to reconsider that motion. ECF 183. I am not reconsidering either decision now.

In order to address Rabiu's claims, I need to decide what weight, if any, to afford his reports.

Abbott asks me to disregard both reports. In the first place, Abbott argues that they are untimely, given that Rabiu disclosed neither expert in discovery. In the second, Abbott argues that they are inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). And in the third place, Abbott asks, if I find the reports admissible, to "afford them little evidentiary value given their glaring deficiencies." ECF 192 at 8.

I agree with Abbott that I cannot rely on Rabiu's experts. Leaving aside their timeliness, neither is reliable on its own merits and neither meets the requirements for admissibility. Federal Rule of Evidence 702 allows admission of an expert opinion if it is "based on sufficient facts or data" or it is the "product of reliable principles and methods." The Rule "assign[s] to the trial judge the task of ensuring that an [expert opinion] both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Under *Daubert,* I consider: (a) "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue;" (b) whether "the reasoning or methodology underlying the testimony is scientifically valid;" and

(c) "whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. The Advisory Committee notes to Rule 702 suggest other reliability factors, including: (1) "[w]hether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying;" (2) "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;" (3) "[w]hether the expert has adequately accounted for obvious alternative explanations; and (4) "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting." (citations omitted).

The first expert report is a wage analysis performed by the Smith Economics Group (the "Smith Report") which charts Rabiu's economic past and future in a scenario where Abbott had not discriminated against him. ECF 185-2. The report concludes that Rabiu's salary would have increased by $120,000 had he been promoted in 2019. ECF 185-2 at 4. The report also concludes that he would have been promoted several more times in rapid succession (eventually to the presidency of the company) with corresponding salary increases at each step. *Id.* The $1,367,756 back pay figure thus emerges from the discrepancy between what Rabiu was actually

paid from 2019-2025 versus what he would have made in the Smith Report scenario.[3] *Id.* at 9. Rabiu's $17,084,737 front pay figure emerges from what he would have made, had he continued to work at Abbott (from 2031 as its CEO) until retirement at age 67. ECF 185 at 8, 185-2 at 14.

The Smith Report fails under Rule 702 and *Daubert* because its premises emerge from thin air. The report is explicit that it assumes that Rabiu would be rapidly promoted because Rabiu told the Smith Group to make that assumption. ECF 185-2 at 4. Even taking as true Rabiu's contentions about his job performance, it is incredible for an expert to assume that in a few years he would be promoted from a mid-level management position with no direct reports to the presidency of one of the world's largest pharmaceutical firms. The Smith Report likewise bases its numbers for what salary Rabiu would have commanded after each of his hypothetical promotions on numbers that Rabiu supplied. *Id.* And as Abbott points out, these numbers come from nowhere at all and do not line up with Abbott's pay schedule. ECF 192 at 13-14. I also note that, while the numbers Rabiu gave his expert were generally

---

[3] The Smith Report actually tallies the discrepancy as $1,246,162 and then adds $121,594 in "benefits." The details of these calculations, though opaque and unreliable in their own way, are irrelevant given the lack of any basis for the salary numbers in the report, which I will address shortly.

favorable for him, the number he provided for his salary as president—$674,000—is less than one thirty-seventh of Abbott's current CEO's publicly-documented annual compensation. ECF 185-2 at 4.[4] The Smith Report's numbers do not correspond to reality.

An expert conclusion resting on numbers and assumptions conjured up by a plaintiff is not based on the "sufficient facts or data" required by Rule 702 and has been formed "without sufficient [expert] evidence confirming the validity of [its] premise[s]." *Korte v. ExxonMobil Coal USA, Inc.*, 164 F. App'x 553, 557 (7th Cir. 2006). I also suspect that the author of the Smith Report was not "'being as careful as he would be in his regular professional work outside his paid litigation consulting'" when he accepted all of Rabiu's numbers without checking them. F.R.E. 702 Advisory Committee Note (citing *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997)).

While I will resort to the Smith Report for certain figures— it contains Rabiu's actual earnings over part of the relevant

---

[4] *See*, *e.g.*, Katherine Davis, "Abbott CEO pocketed nearly $25 million last year," *Crain's Chicago Business* (Mar. 24, 2022), https://www.chicagobusiness.com/health-care/abbott-ceo-robert-ford-pocketed-nearly-25-million-last-year (reporting that about $1.5 million was paid as salary, with the rest coming in stock and other compensation).

period, for example—I agree with Abbott that its conclusions are unreliable and inadmissible.

The second expert opinion that Rabiu appended to Damages Memo is a "Forensic Psychiatric Evaluation Report" produced by Dr. Adesoji Gbadebo Olabanji at the Peach Care Medical Centre in Lagos, Nigeria (the "Olabanji Report"). The Olabanji Report supports Rabiu's compensatory damages claim by concluding that his mistreatment at Abbott caused him to suffer from depression, anxiety, and PTSD. The report supports Rabiu's back and front pay claims by concluding that the mental illnesses Abbott caused are "permanently disabling in relation to corporate employment," leaving him unable to work. ECF 185-3 at 4. Rabiu argues that, because Abbott caused his permanent unemployment, he has no prejudgment duty to mitigate damages and that, postjudgment, Abbott must compensate him through the end of his working life.

The Olabanji Report has serious deficiencies. It does not discuss Dr. Olabanji's qualifications, does not explore how he evaluated Rabiu (beyond the statement that he has treated Rabiu since 2019 which, given the next paragraph, appears to be false), or get into how Dr. Olabanji's training and experience led him to the conclusion that Abbott's mistreatment has so damaged Rabiu that he can no longer work. Without any of this, I cannot under Rule 702 determine whether Dr. Olabanji's opinion is the "product

9

of reliable principles and methods" or whether, under *Daubert*, the "reasoning or methodology underlying [his opinion] is scientifically valid." 509 U.S. at 592-93. And as to whether the report "gr[ew] naturally and directly out of research [Dr. Olabanji] conducted independent of the litigation, or whether [he] developed [his] opinions expressly for purposes of" this case, I find it telling that the report closely tracks both the structure and language of Rabiu's complaint and other filings. F.R.E. 702 Advisory Committee Note (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)).

Most concerning are aspects of the Olabanji Report which suggest its having been fabricated. First, there are factual discrepancies between the report and the record. Dr. Olabanji claims in the report that he has been treating Rabiu continuously since 2019, but Rabiu reported in his answer to an October 2023 interrogatory that he had no mental health treatment provider at that date and had not had one since at least 2016. ECF 185-3 at 1; 192-4 at 5-6. Rabiu stated in his deposition that he had been diagnosed by a Nigerian psychologist in 2020, but that doctor's name was Solji Banja. ECF 94-1 at 49. And Rabiu stated that when he began receiving treatment in 2021, it was with Dr. Banja, not Dr. Olabanji. *Id.* at 50.

10

Next, as Abbott notes, the Peach Care Medical Centre website does not include psychiatry, psychology, or any mental health practice as one of its specialties. ECF 192 at 12 (citing "Our Practices," Peach Care Medical Centre (last visited Dec. 15, 2025), https://peachcaremed.com/our-practices/). Dr. Olabanji's profile has him working not at Peach Care but at Ikorodu General Hospital. "Dr. Gbadebo Olabanji Adesoji," LagosMind (last visited Dec. 15, 2025), https://lagosmind.org/faculty/gbadebo-olabanji-adesoji/. The contact information for Dr. Olabanji in the report is misspelled, contains two contradictory phone numbers, and lists an email for Peach Care (also misspelled) rather than for him.[5] ECF 185-3 at 1. Abbott also claims that several AI-detection services determined that the report was written by a generative AI tool like Chat-GPT. ECF 192 at 12-13, 192-3 at 3. Without passing on the question of AI, the report is riddled with formatting and grammatical errors and contains out-of-place elements. For example, after discussing Rabiu's current diagnoses, the report turns to a "Mental Status Examination" of the kind that goes into a medical record during a visit (*e.g.*, "Appearance: Appropriately

_____

[5] As well as containing a typographical error, this email (peachcarcmedical [*sic*] @gmail.com) does not match the one on Peach Care's website (into [*sic*] @peachcaremed.com). "Contact Us," Peach Care Medical Centre (last visited Jan. 30, 2026), peachcaremed.com/contact-us.

dressed, adequate hygiene. Appears fatigued with blunted affect." ECF 185-3 at 7), which is especially baffling, given that the report nowhere refers to a single specific clinical interaction between Rabiu and Dr. Olabanji.

As a result of all of these deficiencies, I will disregard the conclusions in the Olabanji Report as well as those in the Smith Report. I now turn to Rabiu's requested relief.

## B. Economic Relief

Title VII's "primary goal...is to end discrimination." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 230 (1982). The law aims to restore victims "to a position where they would have been were it not for the unlawful discrimination." *Id.* (citing *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)). District courts have broad discretion to make plaintiffs whole through the provision of back pay. *Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018). I can also order prospective relief, including reinstatement or, in lieu of reinstatement, front pay. *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 951-52 (7th Cir. 1998). And the 1991 Civil Rights Act's amendments to Title VII have also made available compensatory and punitive damages, capped in this case at a combined $300,000. 42 U.S.C. § 1981a(b).[6]

---

[6] The damages caps are set according to the size of the defendant company. I take judicial notice that Abbott has more than 500

## 1. Back Pay

Back pay is an estimate of the harm a plaintiff has suffered due to an adverse employment action, calculated by "(1) measuring the difference between actual earnings for the period and those which [the plaintiff] would have earned absent the discrimination by [the] defendant and (2) reducing that amount if the defendant can show failure to take reasonable efforts to mitigate [the plaintiff's] damages." *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 629 n.6 (7th Cir. 2018) (citations omitted). That is, as long as a plaintiff has attempted to mitigate his damages, then he is entitled to back pay amounting to the difference between what he would have been paid and what he was actually paid in the time between the discriminatory action and the entry of judgement. Where a plaintiff has failed to mitigate his damages, his "recovery...[will] be limited accordingly." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 296 (2002).

The adverse employment actions as to which Abbott defaulted were (1) subjecting Rabiu to unequal working conditions; (2) the failure to promote him to Senior Manager; and (2) his constructive discharge. The parties agree that Rabiu's back pay award should

---

employees and is subject to the highest cap under 42 U.S.C. § 1981a(b)(3)(D). Abbott does not dispute that this is the relevant cap.

amount to the difference between what he would have been paid had he been promoted to Senior Manager and his actual earnings from 2020 to the present. They disagree, however, about what the Senior Manager salary would have been and about when and whether Rabiu's duty to mitigate ended.

### a. Duty to Mitigate

The Olabanji Report's key conclusion was that Abbot's discriminatory treatment caused Rabiu to develop mental illnesses that led him to be "permanently disabled from sustained structured corporate employment." ECF 185-3 at 11. Rabiu also independently asserts that his "ongoing trauma, anxiety, and medical issues" make it impossible for him to sustain employment. ECF 185-1 at 10. Rabiu argues that because Abbott caused his disability, he had no ongoing duty to mitigate his damages by pursuing employment. *Id*.

Abbott contends that I should disregard Rabiu's arguments in no small part because Rabiu sought and obtained comparable employment after he left Abbott. I agree. Rabiu's description of his dire medical situation does not square with his deposition. There, Rabiu testified that he obtained a comparably paid contractor position with SC Johnson (the Smith Report lists this as employment with PBC Method Products, which is a subsidiary of SC Johnson) three months after leaving Abbott. ECF 94-1 at 10. Later, and for the 18 months preceding the deposition, Rabiu worked

14

as a senior procurement manager at Johnson Controls, with a salary starting at $151,000 and increasing to $157,000 by the time of the deposition. *Id.* Rather than being "permanently disabled from sustained structured employment," Rabiu was capable of working, and if he stopped working or attempting to work, then he failed to mitigate his damages for back pay purposes. The question then is when, if ever, Rabiu stopped working or attempting to find work.

Rabiu's Damages Memo left the answer to that question vague.[7] I directed him to clarify "during what period(s) [he] was applying for work or when [he] stopped applying for work." ECF 193. Rabiu's response indicated that he was employed with Johnson Controls until October 2024, that he actively sought employment from October 2024 to September 2025, and that after September 2025, he "ceased active job applications," due to "medical guidance," presumably from Dr. Olabanji. ECF 194 at 8–9.

---

[7] The Smith Report suggests that Rabiu stopped working at the end of 2023, ECF 185-2 at 4, while Rabiu's deposition suggests that he continued with Johnson Controls into 2024. ECF 94-1 at 10. Rabiu attached screenshots from LinkedIn to his Damages Memo that suggested he was searching for jobs into 2025, 185-5 at 1–4, while statements in the "Mitigation of Damages" section of a declaration attached to the Damages Memo suggest that he stopped working and job hunting before that. ECF 185-1 at 10 ("Despite diligence, I was unable to sustain employment due to ongoing trauma, anxiety, and medical issues directly resulting from Abbott's unlawful conduct. Title VII does not require a plaintiff to jeopardize his health or safety to satisfy mitigation.").

As such, I find that Rabiu stopped working and attempting to mitigate his damages in September 2025. Because I do not credit the Olabanji Report's conclusions and because Rabiu was working for years following his discharge from Abbott, I find that he was able to work and mitigate his damages after September 2025 but chose not to. His entitlement to back pay ended in that month. *EEOC v. Waffle House*, 534 U.S. at 296.

### b. Salary Figures

To calculate Rabiu's back pay award, I need to determine what the Senior Manager salary would have been, when Rabiu would have begun receiving it, and at what rate it would have grown. Then, I need to compare it to his actual wages over the relevant period, first at Abbott, then as a contractor at SC Johnson, and finally as a salaried employee at Johnson Controls.

The Smith Report sets the Senior Manager salary at $241,000 but gives no basis for that figure. ECF 185-2 at 4. Abbott provides a salary range for the Senior Manager position and suggests that, had he been promoted, Rabiu's wage would have fallen in the middle of that range, at $162,000. ECF 192 at 16; 192-10 at 2. I asked Rabiu to respond to Abbott's proffered salary numbers. ECF 193. Rabiu agrees that the salary range is accurate but disputes that his salary would have fallen at the "presumptive midpoint." ECF 194 at 7. Rabiu does not name any new salary number, but he does

16

gesture towards his complaint, which alleged that his performance was exceptional and that he was denied pay increases because of Abbot's discriminatory conduct over 2019-2021. ECF 1 at 10.

I find that Rabiu's salary, absent discrimination, would have fallen above the midpoint of the range for the Senior Manager position. Rabiu's salary was just shy of the midpoint of the range for the last position he held at Abbott ($123,000 versus $125,000). ECF 94-1 at 59; 192-10 at 2. This was despite his salary having been depressed by two consecutive racially-motivated annual reviews (Abbott concedes that before Rabiu began to suffer from discrimination, he had been rated "Best at Abbott"). ECF 15 at 7. As such, I find that, had Rabiu been promoted and had he never been subject to racial discrimination, his salary would have fallen higher than the midpoint of the range for a given position, including the Senior Manager position. I set his theoretical salary in the Senior Manager position between the upper range ($189,000) and the maximum ($216,000): $202,500.

While both parties acknowledge that Rabiu interviewed for a promotion in September 2019, both also assume that he would have begun receiving the higher salary in January 2020. ECF 185-2 at 4; 192 at 10. I accept that date. Rabiu sets his wage growth at the "national average" for each given year. ECF 185-2 at 5. Abbott assumes a standard 3% annual raise. ECF 192 at 17. Rabiu admitted

that a 3% annual raise was generally what he was entitled to. ECF 94-1 at 59. I use the 3% figure. Rabiu's salary as Senior Manager, then, would have been set at $202,500 beginning in January 2020 and increased 3% each year thereafter. These figures are reflected in the table below:[8]

|  | Senior Manager Salary |
|---|---|
| **2020** | $202,500 |
| **2021** | $208,575 |
| **2022** | $214,832 |
| **2023** | $221,277 |
| **2024** | $227,916 |
| **2025** | $234,753 |

The parties differ over how to treat Rabiu's actual earnings over this same period. The Smith Report offers Rabiu's annual income and compares it to the Senior Manager salary over the same years. ECF 185-2 at 4, 9. Abbott uses another approach in order to argue that back pay should be cut off after September 2021.

Abbott calculates that, at a Senior Manager salary, Rabiu would have been making $3,476 per week in 2021.[9] The Smith Report has Rabiu reporting $67,907 of income with SC Johnson from

---

[8] Throughout this memorandum, I have rounded figures to the nearest dollar.

[9] I cannot determine where this number comes from. When divided by 52, Abbott's salary number for that year, $166,860, would equal $3,208 per week.

September to December 2021, which would work out to $4,244.19 per week.[10] Abbott concludes that, because his weekly wage was higher at SC Johnson, Rabiu had fully mitigated his damages and should be owed no back pay in the period after he started working for that company in September 2021.

I use Rabiu's annual methodology. In the first place, I have adopted a higher Senior Manager salary than Abbott used in its calculations. In the second, Rabiu was in and out of work until he stopped looking in September 2025, whereas his intent, absent discrimination, had been to remain at Abbott through to the present, and the aim of a back pay award is to restore him to where he would have been absent discrimination. ECF 194 at 10; *Ford Motor Co v. EEOC*, 458 U.S. at 230. And in the third place, Rabiu was a salaried employee at Abbott, not an hourly one, and it is appropriate to tabulate his earnings annually. Otherwise, rather than using Abbott's straight weekly-wage comparison, I would need to try to price Rabiu's benefits package at Abbott into his salary to directly compare it with his hourly rate at SC Johnson (not to

---

[10] I note a discrepancy for completeness's sake. Rabiu reported in his deposition, ECF 94-1 at 10, that he was making $90-100 per hour, which would come out to $3,600-4,000 per week without overtime.

mention that I might need to explore whether he was earning overtime at that new job).

All of that said, I calculate Rabiu's back pay by comparing his annual income over 2020-2026 with the Senior Manager salary over that same period. I take his 2020-2023 income from the Smith Report (which gets it from his W-2s). In his response to my minute entry, Rabiu indicated that he continued working at Johnson Controls through October 2024 but did not clarify if his salary increased in 2024. As such, I have set his 2024 income as a pro-rata portion of his 2023 salary (ten-twelfths of $171,965: $143,304). I have run the calculation through September 2025, when Rabiu stopped attempting to mitigate his damages; I have thus not awarded him any back pay for the period from October 2025 through the present. The results of my calculations are in the table below:

| | Actual Abbot Earnings | SC Johnson Earnings | Johnson Controls Earnings | Total Actual Earnings | Senior Manager Salary | Discrepancy |
|---|---|---|---|---|---|---|
| 2020 | $121,000 | $ – | $ – | $121,000 | $202,500 | $ 81,500 |
| 2021 | $51,682[11] | $ 67,907 | $ – | $119,589 | $208,575 | $ 88,986 |
| 2022 | $ – | $ 72,941 | $ 83,131 | $156,072 | $214,832 | $ 58,760 |
| 2023 | $ – | $ – | $ 171,965 | $171,965 | $221,277 | $ 49,312 |
| 2024 | $ – | $ – | $ 143,304 | $143,304 | $227,916 | $ 84,612 |
| 2025 | $ – | $ – | $ – | $ – | $176,065 | $ 176,065 |
| | | | | | Total: | $ 539,235 |

Rabiu's total back pay thus comes out to $539,235.

## 2. Front Pay

Rabiu requests front pay, basing his calculations on the Smith Report. Abbott argues that Rabiu, who claims that he is permanently disabled and cannot work, is not entitled to any front pay.

Title VII allows courts to reinstate plaintiffs to the positions they occupied before they were discharged, and, where reinstatement would be inappropriate, to award front pay instead. *Pharmacia*, 137 F.3d at 951–52; 42 U.S.C. § 2000e-5(g)(1). Front pay "is awarded for a reasonable period of time, until a date by which the plaintiff, using reasonable diligence, should have found

---

[11] Rabiu worked at Abbott for five months in 2021. I reach this figure by multiplying his salary that year, $124,037, by five-twelfths.

comparable employment." *Pharmacia*, 137 F.3d at 954 (citations omitted).

Rabiu's theory of front pay is that (1) Abbott caused him to be permanently disabled by way of his mental illnesses; (2) his disability means that he could never have obtained comparable employment, so his front pay should continue until he would have retired; that (3) he would have worked at Abbott until his retirement at 67; and (4) that he would have been promoted several times before retirement, working as the president of Abbott from 2031 onwards.

Rabiu's argument is not persuasive. I have, for reasons discussed above, rejected the Olabanji Report. I have likewise rejected the optimistic assumptions about Rabiu's hypothetical future promotions at Abbott. And as I noted above, Rabiu *did* find comparable employment, at Johnson Controls, in 2023. Even if I accepted that he was permanently unable to work, I can locate only one case in which a court awarded front pay through retirement due to a disability caused by the employer. *Gotthardt v. National R.R. Passenger Corp.*, 191 F.3d 1148, 1156 (9th Cir. 1999). That case is an outlier. *See*, *e.g.*, *Nehara v. California*, 2013 WL 1876122, *1, *3 (E.D. Cal. May 3, 2013).

As it is, because I have found that Rabiu voluntarily withdrew from the workplace, I do not award him front pay.

22

### 3. Compensatory and Punitive Damages

Rabiu moves for both compensatory and punitive damages, asking in each case for their combined cap, $300,000. Abbott argues that a more appropriate compensatory number would be between $15,000 and $50,000. Abbott contends that Rabiu is not entitled to punitive damages because he did not pray for them in his complaint.

Preliminarily, I agree that Rabiu is not entitled to punitive damages because they do not appear in his complaint. ECF 1 at 16–26. "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed.R.Civ.P. 54(c). Even where pled, "punitive damages based on a default judgment appear to be the exception rather than the rule in the Seventh Circuit." *Coast to Coast Claim Servs., Inc. v. Yagelski*, 2022 WL 16573461, *1, *4 (N.D. Ill. Oct. 31, 2022) (citations omitted) (collecting cases).

Courts have identified two types of injuries for which Title VII provides access to compensatory damages. The first is an "injury to professional standing" or an "injury to character and reputation" resulting in lost future earnings. *Pharmacia, Inc.*, 137 F.3d at 952 (internal quotations and citations omitted). Lost future earnings are distinct from front pay and amount to how much the discrimination has "'narrowed the range of economic opportunities available to [the plaintiff].'" *Id.* (citing *McKnight*

23

*v. General Motors Corp.*, 973 F.2d 1366 1370 (7th Cir. 1992)). The second type of injury is distress, physical or emotional, resulting from the discrimination suffered. *Vega v. Chicago Park District*, 954 F.3d 996, 1008-09 (7th Cir. 2020).

Rabiu asserts that his professional reputation has been harmed by Abbott's conduct, although he does not explain how his negative performance reviews or internal Abbott decisions would have become public knowledge. On this point, he runs into the same problem as he does in his back and front pay arguments—he obtained comparable employment, at a higher wage than he had earned at Abbott, just three months after he left.

Rabiu also claims to have experienced prolonged and profound physical and emotional distress as the result of his treatment, and here he is on firmer ground. Rabiu writes that he struggles with "depression, anxiety, and post-traumatic stress" and that he lives, as a result of that distress, with chronic gastritis. While I have discounted the findings of the Olabanji Report, expert support for Rabiu's distress is not required. *Gracia v. SigmaTron International, Inc.*, 842 F.3d 1010, 1022 (7th Cir. 2016) ("An award for nonpecuniary loss can be supported...solely by a plaintiff's testimony about his or her emotional distress.") (citations omitted). Likewise, Rabiu's report of his emotional upset is buttressed by affidavits from his wife, brother, and sister-in-

law, all detailing the toll that his treatment at Abbott has taken on him. ECF 185-7–185-9.

Abbott argues that recent cases in this circuit show that $300,000 in compensatory damages would be "monstrously excessive," given that Rabiu is "more appropriately characterized as the 'ordinary victim' of employment discrimination." ECF 192 at 26. Abbott cites several cases from this circuit for the proposition that emotional distress like Rabiu's is worth somewhere between $15,000 and $50,000, but that either more serious discrimination or more serious suffering would be required beyond that.

The case law permits a range of acceptable awards. For example, in *Gracia v. Sigmatron*, the plaintiff's "only evidence of non-economic damages was her statement to the jury, 'It was hard. I was just depressed. I have always been used to working.'" 842 F.3d at 1022. There, the Seventh Circuit upheld a $50,000 award. *Id.* at 1021–23. In *Vega v. Chicago Park District*, 954 F.3d 996, 1002, 1008–09 (7th Cir. 2020), the Court of Appeals upheld a $300,000 compensatory damages award on the basis of the plaintiff's testimony that she had suffered "emotional, mental, and physical distress" in the final six months of her employment. In any case, "Awards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range

beyond which awards are necessarily excessive." *Sigmatron*, 842 F.3d at 1023 (collecting various awards) (citations omitted).

In that light, I set Rabiu's compensatory damages at $50,000.

### 4. Interest

Rabiu requests prejudgment interest on the back pay award. Because back pay is money which a plaintiff should have had use of from the time of the adverse discrimination, making a plaintiff whole generally entails the payment of interest on the award. *Gorenstein Enter., Inc. v. Quality Care-U.S.A., Inc.*, 847 F.2d 431, 436 (7th Cir. 1989) ("The time has come, we think, to generalize, and to announce a rule that prejudgment interest should be presumptively available to victims of federal law violations.").

Rabiu suggests that I should calculate prejudgment interest using the average yield on a one-year U.S. Treasury bond, which he sets at 3%. ECF 185 at 14. He also suggests that I should apply that rate "from the midpoint of the back-pay period (January 1, 2023) through the expected judgment date." *Id.* I decline those suggestions.

Prejudgment interest is generally calculated according to the prime rate. *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998 ("[T]he best starting point is to award interest at the market rate, which means an average of

26

the prime rate for the years in question.") (citations omitted). The average prime rate over 2020-2025 was 5.92%.[12] Prejudgment interest should be compounded, ideally following each time that a plaintiff would have been paid, whether weekly, biweekly, or monthly. *See Arroyo v. Volvo Grp. N.A., LLC*, 2017 WL 2985649, *1, *10 (N.D. Ill. July 13, 2017); *Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1263 (N.D. Ill. 2015) *aff'd* 842 F.3d 1010 (7th Cir. 2016). Rabiu has, however, failed to provide his pay schedule, and I will compound the annual total. *Ortega v. Chicago Board of Education*, 280 F.Supp.3d 1072, 1098 (N.D. Ill. 2017) ("[Plaintiff], having failed to present those calculations...has waived them. Instead, the Court will assume for purposes of this calculation that [Plaintiff] received her annual salary as a lump sum at the end of [each year] and calculate the interest on each annual salary amount from that date going forward."). Compounding the interest annually results in the table below:

---

[12] *See* "Bank Prime Loan Rate Changes: Historical Dates of Changes and Rates" Federal Reserve Bank of St. Louis (last visited Dec. 16, 2025), fred.stlouisfed.org/series/PRIME.

I reach the average prime rate by multiplying each rate set by the Federal Reserve over 2020-2025 by the number of days at that rate, adding that total, and then dividing it by the total number of days over the same period.

| | Discrepancy | Total with Previous Year | Interest | Cumulative Total |
|---|---|---|---|---|
| 2020 | $ 81,500 | $ – | $ 4,825 | $ 86,325 |
| 2021 | $ 88,986 | $ 175,311 | $ 0,378 | $ 185,689 |
| 2022 | $ 58,760 | $ 244,449 | $ 14,471 | $ 258,921 |
| 2023 | $ 49,312 | $ 308,233 | $ 18,247 | $ 326,480 |
| 2024 | $ 84,612 | $ 411,092 | $ 24,337 | $ 435,429 |
| 2025 | $ 176,065 | $ 611,493 | $ 36,200 | |
| | | Total Interest: | $ 108,459 | |

Rabiu also requests postjudgment interest "at the statutory rate established by 28 U.S.C. § 1961(a), from the date of entry of judgment until payment in full." Postjudgment interest is mandatory, calculated from the date of judgement "at a rate equal to the weekly average 1-year constant maturity Treasury yield." Postjudgement interest accrues against the entirety of the judgement, including compensatory damages and prejudgment interest. *E.g.*, *Lagstein v. Certain Underwriters at Lloyd's of London*, 725 F.3d 1050, 1056 (9th Cir. 2013). To the extent that there is delay in payment, Rabiu will be entitled to postjudgment interest.

### 5. Fees and Costs

Rabiu requests attorney's fees, the cost of retaining the Smith Group but not Dr. Olabanji, and reimbursement for his future medical costs, as described by the Olabanji Report. Abbott argues

28

that Rabiu is not entitled to recover the costs for the production of a fundamentally defective expert report. I agree. Likewise, inasmuch as the estimate of future medical costs comes from the Olabanji Report, I agree with Abbott that he is not entitled to those, either.

Turning to Rabiu's other request, prevailing parties in civil rights lawsuits may be allowed "a reasonable attorney's fee" under 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988. Abbott opposes the award of attorney's fees on the ground that Rabiu is now *pro se* and that whatever work his former counsel did has not contributed to his victory in this case, citing *Fink v. Ylst*, 2004 WL 7336950, *1, *3 (C.D. Cal. July 8, 2004). *Yslt* relies on *Cabrales v. County of Los Angeles*, 935 F.2d 1050, 1052 (9th Cir. 1991), which stands for "the general rule that plaintiffs are to be compensated [only] for attorney's fees incurred for services that contribute to the ultimate victory in the lawsuit." (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (1983)).

Rabiu is *pro se* and has handled a great deal of this case on his own. However, his previous attorney was present through March 12, 2024, at which point discovery was nearly complete. Rabiu has not cited extensively to the discovery record in his Damages Memo, but it is clear that that record helped him in part to demand the deposition which, ultimately, led to his victory by default. Now

29

that he has provided additional information in response to my minute entry, I award Rabiu $27,875 in attorney's fees.

### 6. Promissory Estoppel

Rabiu requests that I award him $10,000,000 on the basis of two statements allegedly made to him by Abbott's CEO Robert Ford in a meeting on July 6, 2020. These were, "'*We will give you money*,'" and "'*We will compensate you financially*.'" ECF 185 at 15 (emphasis in original). Rabiu frames this request under "longstanding principles of promissory estoppel and equitable restitution." *Id.* at 16. Abbott objects that Rabiu failed to plead a claim for this money and that these statements, drawn from Rabiu's declaration in support of his Damages Memo, should be struck under the sham affidavit rule.

I will not award Rabiu $10,000,000. He offered no promissory estoppel claim in his complaint, and his deposition testimony about the alleged July 2020 meeting directly contradicts the Robert Ford quotes that he offers from that meeting in his declaration. *See* ECF 192 at 23–24; *see also Kelly v. Stevanovich*, 40 F.4th 779, 787 (7th Cir. 2022) (applying the sham affidavit rule outside of the summary judgment context); *Ward v. Sutter Valley Hospitals*, 2023 WL 1824198, *1, *3 (E.D. Cal. Jan. 11, 2023) (same).

## 7. Tax Offset

Rabiu requests that any award be increased by an amount sufficient to offset the additional tax liability he will incur as a result of the award. He is entitled to such an offset. *EEOC v. N. Star Hosp., Inc.*, 777 F.3d 898, 904 (7th Cir. 2015) ("Put simply, without the tax-component award, [a plaintiff] will not be made whole, a result that offends Title VII's remedial scheme.").

Back pay awards should be reported as gross income in the year they are received. "Reporting Back Pay and Special Wage Payments to the Social Security Administration," IRS Pub. 957 (Rev. Jan. 2024), irs.gov/publications/p957. Interest on judgements should be counted as gross income in the year it is received. "Settlements—Taxability," IRS Pub 4345 (Rev. Sep. 2023), irs.gov/pub/irs-pdf/p4345.pdf. Where compensatory damages in employment discrimination suits are not the result of physical injuries, they should be counted as gross income in the year they are received. "Tax implications of settlements and judgments," IRS (last visited Dec. 16, 2025), irs.gov/government-entities/tax-implications-of-settlements-and-judgments. Each component of the judgment except attorney's fees, then, is taxable as gross income. Minus fees, the judgment comes out as follows:

31

| Back Pay | $ | 539,235 |
|---|---|---|
| Compensatory Damages | $ | 50,000 |
| Prejudgment Interest | $ | 108,459 |
| **Taxable Total** | **$** | **697,694** |

Because Rabiu is not currently employed and avers that he will not be employed, the judgment will be his only income in 2026. The following table applies this year's rates[13] to the judgment:

| Range Taxed | Marginal Rates | Amount Taxed at Each Rate | | Tax Liability | |
|---|---|---|---|---|---|
| $0 - $24,800 | 10% | $ | 24,800 | $ | 2,480 |
| $24,800-$100,800 | 12% | $ | 76,000 | $ | 9,120 |
| $100,800-$211,400 | 22% | $ | 110,600 | $ | 24,332 |
| $211,400-$403,550 | 24% | $ | 192,150 | $ | 46,116 |
| $403,550-$512,450 | 32% | $ | 108,900 | $ | 34,848 |
| $512,450-$697,964 | 35% | $ | 185,244 | $ | 64,835 |
| | | **Total** | | **$** | **181,731** |

Rabiu's total tax liability for the judgment is thus $181,731. Adding that to the judgment along with the $27,875 in attorney's

---

[13] These are obtained from "IRS releases tax inflation adjustments for tax year 2026, including amendments from the One, Big, Beautiful Bill," IRS IR-2025-103 (Oct. 9, 2025), https://www.irs.gov/newsroom/irs-releases-tax-inflation-adjustments-for-tax-year-2026-including-amendments-from-the-one-big-beautiful-bill.

fees gives the total amount of the award: $907,300. This final table contains each constituent of the total:

| Back Pay | $ | 539,235 |
|---|---|---|
| Prejudgment Interest | $ | 108,459 |
| Compensatory Damages | $ | 50,000 |
| Tax Offset | $ | 181,731 |
| Attorney's Fees | $ | 27,875 |
| Total | $ | 907,300 |

### F. Injunctive Relief

Lastly, Rabiu requests four species of what he calls "equitable and ancillary relief," including: (1) that Abbott remove all references to negative performance from his employment records; (2) that Abbott acknowledge in writing its failure to pay the restitution that CEO Rob Ford promised in the July 2020 meeting; (3) that I state conclusively in this order that Rabiu's termination and career interruption were the result of discrimination; and (4) that I include a "continuing enforcement clause" in this judgment. ECF 185 at 19–20.

Under Title VII, I have broad power to order "any other equitable relief as [I deem] appropriate." 42 U.S.C. § 2000e-5(g)(1). As Abbott has not objected to Rabiu's first request, I order Abbott to, in line with Rabiu's language, reduce his personnel record to neutral facts including his title, tenure, and

33

a note that his departure was unrelated to performance or misconduct.

As to the second request, Abbott disputes that CEO Rob Ford made any statements about compensating Rabiu, and Rabiu's deposition contradicts the declaration in which he claims that Ford made these statements. I decline to grant this request.

The third request is covered by the fact of Abbott's default. Abbott declined to promote Rabiu to Senior Manager in 2020 because of his race. Likewise because of his race, Abbott created a hostile work environment that gave Rabiu no choice but to leave his job. The fourth request is granted by the fact of the judgment. Should Abbott not comply, Rabiu is free to return to me and move for enforcement.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: February 9, 2026

34