IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Azeez Rabiu, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 23 C 2253 |
| | ) | |
| | ) | |
| Abbott Laboratories, | ) | |
| | ) | |
| Defendant. | ) | |

Memorandum Opinion and Order

In this Title VII case, defendant Abbott Laboratories moved for the entry of default. I entered default and, after briefing, entered a judgment awarding plaintiff Azeez Rabiu damages and injunctive relief. Both parties have moved to amend that judgment pursuant to Federal Rule of Civil Procedure 59(e), Rabiu has moved for relief from a part of that judgment under Rule 60(b)(1), and Abbott has moved to waive its obligation to post a supersedeas bond. I deny all but the motion as to the bond.

1

**I.**

Rabiu worked for Abbott from 2017 to 2021, first as a high-level non-managerial employee and then in an entry-level managerial role.[1] Abbott subjected Rabiu to disparate treatment because of his race, denying him a deserved promotion and causing him to shoulder the workload of several other employees, which eventually resulted in his constructive termination.

Rabiu filed suit and Abbott eventually moved for default against itself in order to avoid the deposition of its CEO. The parties briefed damages—Rabiu asked for something in the nature of $40 million, while Abbott suggested the total should be closer to $100,000—and I awarded Rabiu $907,300.[2] Both parties now argue pursuant to Rule 59(e) that I landed on a number too far away from their original suggestions. Rabiu likewise contends that he should

---

[1] Readers can refer to my previous opinion for slightly more detailed facts. *Rabiu v. Abbott Laboratories*, 819 F. Supp. 3d 864, 868–69, 872–877 (N.D. Ill. 2026).

Following default, "Any allegations in the complaint relating to liability are considered true." *Domanus v. Lewicki*, 742 F.3d 290, 303 (7th Cir. 2014). But the Seventh Circuit allows "broad latitude in quantifying damages, especially when the defendant's own conduct impedes quantification...even speculation has its place in estimating damages." *Id.* (cleaned up).

[2] Of this judgement, $539,235 was back pay, *Rabiu*, 819 F. Supp. 3d at 876, with the remainder made up of a compensatory award, *id.* at 878, interest, *id.* at 879, attorney's fees, *id.*, and a tax offset, *id.* at 880–81.

2

have been able to pursue uncapped punitive damages but was prevented from doing so by the excusable neglect of his prior counsel, and he asks for relief from the part of the judgement that denied him such damages under Rule 60(b)(1).

## II.

Parties may move to alter or amend a judgment under Federal Rule of Civil Procedure 59(e). Such a motion will be meritorious only where "there is newly discovered evidence" or where I have committed "a manifest error of law or fact." *Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir. 2006). Parties seeking relief from judgment under Rule 60(b)(1) must identify the presence of "mistake, inadvertence, surprise, or excusable neglect" justifying relief.

While the two rules resemble one another in some respects, "Rule 60(b) relief is an extraordinary remedy and is granted only in exceptional circumstances." *Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831, 837 (7th Cir. 2005) (citations omitted). Rule 59(e) relief is less exceptional and requires only that the movant "clearly establish" one of the grounds for relief. *Romo v. Gulf Stream Coach, Inc.*, 250 F.3d 1119, 1121 n.3 (7th Cir. 2001). Nevertheless, a Rule 59(e) motion is not the place "to advance arguments or theories that could and should have been made before

the district court rendered a judgment." *Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 932 (7th Cir. 2018) (citations omitted).

In either case, the grant or denial of such motions is within my sound discretion. *Harrington*, 433 F.3d at 546 (citing *Romo*, 250 F.3d at 1122 n.3).

## III.

Rabiu based most of his original damages brief on two expert reports, both of which I found failed to satisfy the requirements for such reports under Federal Rule of Evidence 702. Rabiu's first argument under Rule 59(e) is that I made manifest errors of fact when I threw out his psychiatric report on those grounds. His second argument is that, in the light of his reinstated psychiatric report, my decisions as to front pay and compensatory damages were manifestly in error. And his third argument, this time going to Rule 60(b)(1), is that his prior counsel's intransigence prevented him from pursuing uncapped punitive damages.

Abbott, for its part, has limited its post-judgment motion to one ground, which is that I made manifest errors of factual interpretation when I set Rabiu's theoretical salary—in a theoretical world in which Abbott had not discriminated against him—too high along a salary scale that Abbott had provided.

4

### A. Rabiu's Grounds for Amendment and Relief

### 1. The Expert Psychiatric Report

Rabiu tendered the report of Dr. Adesoji Gbadebo Olabanji, a psychiatrist working out of Lagos, Nigeria. Dr. Olabanji's conclusion was that Abbott's mistreatment had destroyed Rabiu's mental health and had caused him to be unable to engage in, specifically, further corporate employment. This last contention was crucial to Rabiu's theory, which I will turn to in a moment, that he was owed front pay through the end of his working life.

I found the Olabanji report seriously lacking under Rule 702 and the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Specifically, I found that the report "[did] not discuss Dr. Olabanji's qualifications, [did] not explore how he evaluated Rabiu...or get into how Dr. Olabanji's training and experience led him to the conclusion that Abbott's mistreatment had so damaged Rabiu that he can no longer work." *Rabiu*, 819 F. Supp. 3d at 871. Without that information, I could not determine whether Dr. Olabanji's opinion was the product of reliable principles and methods or whether his reasoning was scientifically valid. *Id.* I also noted that Abbott had suggested the report was written by AI and that it might have been fabricated. *Id.* at 872. Without making a finding as to either suggestion, I noted that the report was riddled with typographical

5

and grammatical errors, misstatements and misspellings, and was formatted in a way it would be generous to describe as unusual. *Id.*

Rabiu in the instant motion argues that I made three sets of errors here. The first has to do with Rabiu's right to due process. The second was in finding that Dr. Olabanji does not exist or that the report was fabricated. The third is that each of my findings as to why the report failed to meet the requirements of Rule 702 and *Daubert* was the result of a mistake of fact.

Rabiu argues first that I failed to put him on notice that his report might be deficient. After I granted Abbott's motion for entry of default, Rabiu submitted a damages brief and then Abbott filed a response. Rabiu was proceeding *pro se* at this point and did not file a reply, so I directed him to do so, and I asked him by minute entry to address four areas where his original brief had omitted critical facts—for example, when he stopped mitigating his damages. ECF 193. I did not direct Rabiu to address Abbott's arguments as to why the report should not be admitted, and Rabiu contends that I deprived him of an opportunity to be heard on those issues by failing to direct him to address them. But my minute entry did not entitle Rabiu to ignore Abbott's brief, which pointed out, in detail, the many shortcomings of the Olabanji report, and Rabiu is entitled to no relief on this basis.

6

As to the second contention, I simply did not find that the report was fabricated, and I did not disregard the report because it was fabricated. *Rabiu*, 819 F. Supp. 3d at 872. I did note, however, that the "aspects of the Olabanji Report which *suggest* its having been fabricated," like systematic misspellings and misstatements, and that the report in no way resembled the typical output of a physician or an expert, were "concerning." *Id.* (emphasis added). Rabiu now asserts that these many errors constitute not proof of fabrication but "evidence of a Nigerian clinician preparing a document for an American court for the first time." ECF 204 at 16. That may be so, but it is no excuse—overseas physicians can, have, do, and will participate as experts in U.S. court proceedings, but they must do so in a way that is acceptable under the rules of evidence.

As for his third argument, Rabiu contends that I erred by finding three deficiencies under *Daubert*: "no qualifications, no clinical interactions, no analytical basis." ECF 225 at 15. Rabiu argues that, because Dr. Olabanji wrote "M.D." after his name and that his signature block indicated that he was a psychiatrist, the report discussed his qualifications. This is inadequate. These two snippets did not tell me how long Dr. Olabanji had been working, whether he worked in a specific subject area, whether he had been published, or whether he had reached similar conclusions before.

7

*See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("[S]imply because a doctor has a medical degree does not make him qualified to opine on all medical subjects...[t]he question we must ask is not whether an expert witness is qualified in general but whether his qualifications provide a foundation for him to answer a specific question.") (cleaned up). Rabiu points out that the report states that Dr. Olabanji was his "ongoing treating psychiatrist" and that its opinions were based on Olabanji's "training, experience, review of records," and his treatment of Rabiu, but this is boilerplate, and does not explain what any of that training, experience, or review were or *how* they connected to the report's conclusions.

Next, Rabiu writes that, *contra* my conclusion, the report does refer to specific clinical interactions between Dr. Olabanji and himself. As evidence he points to dates scattered more or less at random throughout the report. ECF 225 at 18–19. For example, he suggests that I should take an August 2025 date in the report's header on its first page and intuit that that date is referring to a "mental status examination," notes from which appear as a *non sequitur* six pages later. This will not do. There are many requirements an expert report must meet, but first it must at least be intelligible, and this one, in this sense, is not.

8

Finally, Rabiu argues that I erred in finding that the report failed to adequately explain how Dr. Olabanji arrived at the conclusion that Rabiu was specifically disabled as to corporate employment.[3] Rabiu points to a "numbered five-factor analytical framework" in one section of the report. ECF 225 at 20. But this section of the report is just a list of "factors" drawn directly from Rabiu's complaint—there is no "framework" here, much less one connected to Dr. Olabanji's expertise or to any recognized medical practice. ECF 185-3 at 9–10. I did not and do not need to find that Dr. Olabanji was phantasmal or that Rabiu concocted the report. It was unacceptable, as written, under any circumstances.

### 2. Front Pay and Compensatory Damages

Rabiu's arguments that I erred in failing to award him front pay through the end of his working life and in failing to grant him the maximum allowable compensatory damages are both premised on the assumption that I will have reinstated the Olabanji report. I have not, and his theories have otherwise been dealt with in my prior opinion. *Rabiu*, 819 F. Supp. 3d 876–78.

---

[3] The report also asked me to ignore, despite its conclusion that Rabiu's disability had made him permanently unable to do business, the fact that he engaged in business after he had been so disabled. It made this request in a section titled "Entrepreneurial Activity as Coping." ECF 185-3 at 11. This may be a time to borrow the doctrine of *res ipsa loquitur* from tort.

### 3. Punitive Damages

Rabiu moved to amend his complaint after the entry of default to include a claim under 42 U.S.C. § 1981, a section under which plaintiffs' access to punitive damages is uncapped, unlike under Title VII. 42 U.S.C. § 1981a(b). I denied that motion. *Id.* at 869 n.2. I also denied Rabiu's request for punitive damages under Title VII because he had failed to plead them in his complaint. *Id.* at 877. Rabiu now advances two arguments under Rule 59(e) in an attempt to claw back those damages.

First, he asserts that because his complaint's prayer for relief ended with "'such other and further relief as this Court deems just and proper,'" he preserved a claim for punitive damages. ECF 204 at 34. Second, he writes that because he included a citation to Section 1981 in his complaint, although he never included a request for punitive damages under that section nor developed a claim under that section, he should be entitled to the kinds of damages which "flow" from that section. *Id.* The minor problem with the first issue is that Rabiu has mis-cited his complaint (nothing like that quote appears on the page he cites, ECF 1 at 19) and likewise misquoted it (the closest thing in the document is a request for "such relief as may be just and proper," four pages after Rabiu's pincite, ECF 1 at 23). The major problem with both is that Rabiu cites no support for either, and even if

they had some merit, he could have made both of these arguments before I entered judgment, which means that he cannot raise them now. *Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 932 (7th Cir. 2018).

### 4. Excusable Neglect

Finally, pursuant to his Rule 60(b) motion, Rabiu argues that his prior counsel failed, despite Rabiu's many requests that he do so, to amend his complaint to include a claim under Section 1981. Rabiu contends that his counsel's failure, which he frames as neglect, entitles him to relief under Rule 60.

He is wrong for at least two reasons. First, as Abbott points out, an attorney's errors are imputed to the client and, almost as a rule, the remedy for an attorney's mistakes is a malpractice lawsuit, not relief under Rule 60. *See Stewart v. Caterpillar, Inc.*, 2014 WL 1558112, at *3-*4 (N.D. Ill. Apr. 18, 2014) (discussing excusable neglect in this context and collecting cases). Second, Rabiu's prior counsel withdrew his appearance on March 13, 2024. Rabiu moved to amend his complaint to add a claim under Section 1981 on August 4, 2025, after I had granted Abbott's motion for entry of default. The delay, that is to say, was Rabiu's, not his attorney's, and it was not excusable.

### B. Abbott's Grounds for Amendment

Abbott's argument that I have erred is straightforward. After Rabiu submitted his rather fanciful damages brief, Abbott

11

responded with its much lower estimate and attached a pay table which contained a salary range for the position that Rabiu would have obtained if not for Abbott's racial discrimination against him. The salary range ran from $108,000 to $216,000, with its "control point" at $162,000 and its "upper" point at $189,000. Abbott suggested that Rabiu's hypothetical salary, in the event of his hypothetical promotion, would have been set at $162,000. I reasoned that the facts to which Abbott had admitted by defaulting would have made Rabiu a somewhat singular employee, and I set his hypothetical salary between the upper and maximum numbers, at $202,000. Because the back pay calculation ran for several years, this increase resulted in a significantly larger award for Rabiu.

Abbott's argument is that I "misunderstood" the salary table it provided. ECF 207 at 5. Abbott's specific contention, which I would find difficult to believe in a vacuum, is that at Abbott, "there is nothing tying performance reviews or performance history to higher starting salary within the range upon promotion." ECF 207 at 5. That is, the pay one receives at Abbott is divorced from one's performance, and an employee like Rabiu, who, again, under the facts as defaulted to by Abbott, was a high achiever, would have started his new position "at or below the midpoint in the Salary Range Table." *Id.*

12

I have a few problems here. First, it defies belief that Abbot's pay at promotion has literally nothing to do with performance before promotion. Abbott's contention that employees simply start around the midpoint would seem to bring into question why there exists a range below the midpoint. And if it really is the case that all employees are treated the same at promotion regardless of their record, that bore explaining in the brief to which Abbott originally attached this table, not after the entry of judgment. Second, the declaration of Nicole Haroian that Abbott provided to help explain the salary table states that "years of experience, performance ratings, skills, and backgrounds...factor[] into where a particular employee's compensation falls within the range." ECF 207-1 at 3. This would seem to indicate that performance does play into the setting of salary.

Third, I must emphasize again that, in order to avoid the deposition by a *pro se* litigant, for one hour, of its CEO, Abbott asked for default and thereby effectively stipulated to a set of facts. That set of facts included that Rabiu, alone, did the work of four people, including three people at higher pay grades than himself, for most of a year, during which time he "successfully delivered on all his assigned goals...as well as larger initiatives within the company." ECF 1 at 4. That those and other facts I

13

referenced in reaching my prior decision could be fairly described as fantastical is beside the point. Because of the default, those are the facts which obtain.

In this legal-hypothetical factual landscape, where Rabiu may have been one of the most capable employees to have ever worked in the corporate world, I found, and I would find again, that his salary would have fallen at the higher end of the salary range provided. Abbott is not entitled to relief under Rule 59(e).

## IV.

Abbott has also moved for a waiver of its duty to post a supersedeas bond under Federal Rule of Civil Procedure 62(b). Waiver is appropriate where the movant "has a clearly demonstrated ability to satisfy the judgment in the event the appeal is unsuccessful." *In re Carlson*, 224 F.3d 716, 719 (7th Cir. 2000). There are several factors bearing on the decision to grant a waiver, all of which weigh in Abbott's favor, and none of which Rabiu has addressed directly. *Dillon v. City of Chicago*, 866 F.2d 902, 904-05 (7th Cir. 1988); ECF 210 at 1-6. Abbott is one of the larger pharmaceutical companies on earth, and I am not concerned that it will be unable to pay.

## V.

I grant Abbott's motion for waiver of supersedeas bond. I deny the other instant motions.

**ENTER ORDER:**

Elaine E. Bucklo

_____

**Elaine E. Bucklo**
United States District Judge
Dated: July 24, 2026

15